Connie Lee HUTCHISON, Leland Henry Hutchison, Sr.; and Dixie Hutchison, Robert Hutchison, and Salena Hutchison, by Their Next Friend Leland Henry Hutchison, Sr., Appellants,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Appellee.

No. 92–1990.

Supreme Court of Iowa.

April 20, 1994.

Linda Hansen Robbins and Michael H. Irvine of Irvine & Robbins, Cedar Rapids, for appellants.

James P. Craig of Moyer & Bergman, Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

Plaintiff Connie Hutchison, her husband, and their children appeal from a judgment entered on a jury verdict denying recovery for underinsured motorist (UIM) benefits from Connie's insurer, defendant American Family Insurance Company (American Family). Connie made a claim for personal injury damages and her husband and children made consortium claims. They raise several assignments of error regarding the trial court's evidentiary rulings.

The Hutchisons contend the district court erred (1) in admitting testimony from defendant's expert witness, (2) in allowing that expert to express an opinion on Connie's injury solely on the basis of reports and data from other experts and not on the basis of any of his own observations, (3) in excluding a videotape that purported to demonstrate how car accidents can cause a head injury such as the one she alleges, and (4) in refusing to allow their counsel to voir dire jurors

about a study that concludes that Iowans pay much less for automobile liability insurance than other Americans.

We affirm the trial court on all assignments of error.

I. *Background facts and proceedings.* On February 24, 1987, Connie Hutchison was driving her car in Cedar Rapids when her car was rear-ended by another car. The other driver's insurer paid the Hutchison family its policy limit of $20,000. The Hutchisons' insurer, defendant American Family, denied their claim for UIM benefits under defendant's policy.

The Hutchisons filed suit against American Family to recover these UIM benefits. They alleged that Connie suffered various mental and emotional problems stemming from a closed-head injury that occurred during her car accident. As a result of this injury, her experts opined that she suffered from partial complex seizure syndrome, an orbital frontal cortex injury, posttraumatic headaches, and an exacerbation and worsening of depression.

During voir dire of potential jurors, the district court barred the Hutchisons from using a report showing that Iowans pay much less for automobile liability insurance than other Americans.

During the testimony of their neurologist, the Hutchisons attempted to play a videotape demonstrating the general mechanism of head injuries. The district court sustained American Family's objections to showing the tape.

American Family's expert witness was a clinical psychologist and neuropsychologist, Dr. Raymond Moore. The Hutchisons began trying to exclude Dr. Moore's testimony with a motion in limine and raised a standing objection to his testimony at trial. Dr. Moore had never examined Connie. He based his opinion on the medical records, data, and other information generated by all of her experts, just as he does in his private practice. He testified that he believed Connie's injuries were preexisting and that she suffered no traumatic brain injury from the motor vehicle accident.[1]

---

1. The following exchange occurred between de-   fendant's counsel and Dr. Moore:

The jury found the Hutchisons had not established that their total damages, excluding property damage to their automobile, exceeded $20,000. Thus, plaintiffs had no valid UIM claim against defendant American Family.

The Hutchisons appeal.

■ Because each of the Hutchisons' assignments of error attack the district court's evidentiary rulings, we will reverse the district court only upon a showing of abuse of discretion in its rulings. *Henkel v. R & S Bottling Co.*, 323 N.W.2d 185, 193 (Iowa 1982).

II. *Dr. Moore's competence as an expert witness.* The Hutchisons contend that American Family's expert witness, Dr. Raymond Moore, was not competent to testify as to Connie's alleged head injury. First, the Hutchisons argue that the district court abused its discretion in allowing Dr. Moore to testify as a neuropsychologist because he lacked board certification. Second, the Hutchisons attack Dr. Moore's competence to testify as to the head injury because such testimony involves medical causation, an issue on which the Hutchisons contend a clinical psychologist such as Dr. Moore cannot express an expert opinion.

Iowa rule of evidence 702 is pertinent to our discussion of both contentions. It provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The advisory committee on the Iowa rules of evidence anticipated arguments such as the Hutchisons' in its comment to rule 702:

If [pursuant to Iowa rule of evidence 104(a)] the Court is satisfied that the threshold requirements have been met, the witness should be allowed to testify. All further inquiry regarding the extent of his qualifications goes to the weight that the fact finder can give such testimony under Rule 104(e).

There is concern that under both the proposed Rule 702 and existing state practice, persons with marginal credentials will be given "expert" status and thereby automatically gain unwarranted recognition of their ideas. However, it is the Committee judgment that through proper use of Rules 104 and 403 more safeguards exist than under the common law.

Rule 702 thus codified Iowa's existing "liberal rule on the admission of opinion testimony." *Ganrud v. Smith*, 206 N.W.2d 311, 314 (Iowa 1973). The United States Supreme Court recently reaffirmed this approach in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, ——, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469, 485 (1993). In *Daubert*, the Court rejected the *Frye* test of admissibility, which required the expert opin-

Q. What did [plaintiff's psychiatrist] indicate to you about your review of the medical records?
A. [He] observed that she was chronically unhappy at home for years, but now was focusing it all on the motor vehicle accident....
Q. Does this comport with your conclusions regarding the hysteria and hypochondriasis scales of the MMPI [Minnesota Multiphasic Personality Indicator]?
A. Yes.
Q. That's the type of thing someone with those high scores like Connie Hutchison might do?
A. Stress would tend to stir up physical symptoms, preoccupations with shortcomings, worry that their memory wasn't working, things like that.
....
Q. Are the opinions and conclusions that you have noted to us today consistent with a rear end collision-type accident involving a car coming up from behind at approximately five miles per hour and striking a stopped vehicle with a person inside in a seat belt?
A. In that it would be—sounds like a fairly harmless accident that wouldn't probably produce a brain injury.
Q. Minor accident?
A. Yes, sir.
....
Q. You don't feel that this accident caused [Ms.] Hutchison to suffer any brain injury?
A. No, I don't.
*Cf.* Orest Eugene Wasyliw & James L. Cavanaugh, Jr., *Simulation of Brain Damage: Assessment and Decision Rules*, 17 Bull.Am.Acad. of Psychiatry Law 373, 374 (1989) [hereinafter Wasyliw & Cavanaugh] ("The most conservative strategy, therefore, would be to suspect malingering when a postconcussive or posttraumatic syndrome is claimed, but not to view such claims *per se* as evidence of malingering or exaggeration.").

ion to be based on a scientific technique that is "generally accepted" as reliable in the relevant scientific community. *Id.* at ——, 113 S.Ct. at 2792, 125 L.Ed.2d at 477 (citing *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)). The Court stated that "the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at ——, 113 S.Ct. at 2799, 124 L.Ed.2d at 485; *see also State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980), *cert. denied,* 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981) (rejecting *Frye* test if reliability can be otherwise established).

We now turn to each of plaintiffs' contentions.

■■■ A. *Board certification.* Although licensing carries a presumption of qualification to testify in the given field, " 'learning and experience may provide the essential elements of qualification.' " *Ganrud,* 206 N.W.2d at 315 (quoting *Jones on Evidence* § 14.13, at 619 (6th ed. 1972)); *see also Bandstra v. International Harvester Co.,* 367 N.W.2d 282, 289 (Iowa App.1985) (lack of license not a bar to accepting a person as an expert witness). Indeed, a trial court may commit an abuse of discretion if it refuses to allow an expert qualified by experience. *Van Wyk v. Norden Laboratories, Inc.,* 345 N.W.2d 81, 86–87 (Iowa 1984). Specifically, in cases involving medical issues, the expert need not be a specialist in a particular field of medicine to give an expert opinion. *DeBurkarte v. Louvar,* 393 N.W.2d 131, 138 (Iowa 1986).

■■■ Dr. Moore has board certification as a clinical psychologist, holds a Ph.D. in clinical psychology, and has substantial experience in neuropsychology. Although Dr. Moore lacked board certification in neuropsychology, we believe this fact went to the weight of his testimony, not its admissibility. Neither the American Psychological Association nor Iowa law, *see* Iowa Code ch. 154B (1991), require board certification in neuropsychology, and only two neuropsychologists have board certification in Iowa. Indeed, one of the Hutchisons' own expert witness neurop-

sychologists, Dr. John Bayless, also lacked board certification.

We therefore conclude that the trial court properly overruled plaintiffs' objection regarding Dr. Moore's lack of board certification in clinical neuropsychology.

■■■ B. *Causation.* We also believe that the district court did not abuse its discretion in admitting Dr. Moore's testimony as a neuropsychologist disputing the existence of a causal relationship between Connie's car accident and her alleged injury.

The Hutchisons cite Iowa Code section 154B.2, which specifically excludes the practice of medicine from the practice of psychology. The Hutchisons also rely on Iowa Code section 147.139, which limits expert testimony regarding the standard of care in medical malpractice actions to persons whose "medical ... qualifications relate directly to the medical problem ... at issue and the type of treatment administered in the case."

■■■ There seems little dispute that a psychologist may testify as to the existence of a brain injury, or at least the condition of the brain in general. *United States v. Riggleman,* 411 F.2d 1190, 1191 (4th Cir.1969); *Jenkins v. United States,* 307 F.2d 637, 643–44 (D.C.Cir.1962); *Ross v. State,* 386 So.2d 1191, 1195 (Fla.1980); *Executive Car & Truck Leasing, Inc. v. DeSerio,* 468 So.2d 1027, 1029 (Fla.App.1985); *Buckler v. Sinclair Refining Co.,* 60 Ill.App.2d 283, 216 N.E.2d 14, 19 (1966); *Simmons v. Mullen,* 231 Pa.Super. 199, 331 A.2d 892, 898 (1974); *see generally* J.A. Bock, Annotation, *Qualification of Nonmedical Psychologist to Testify as to Mental Condition or Competency,* 78 A.L.R.2d 919 (1961 & Supp.1986).

The courts have split, however, over the question involved in this case: whether a psychologist may give expert testimony regarding the causation of brain injury. The majority of the states that have passed on the issue have permitted such testimony. *See, e.g., Fabianke v. Weaver ex rel. Weaver,* 527 So.2d 1253, 1257 (Ala.1988) (affirming trial court's admission of testimony of a neuropsychologist regarding the causal connection between respiratory distress resulting from premature childbirth and risk of a spe-

cific learning disability); *Valiulis v. Scheffels,* 191 Ill.App.3d 775, 138 Ill.Dec. 668, 675–676, 547 N.E.2d 1289, 1296–97 (1989) ("Indeed, it would be somewhat anomalous to conclude that [the clinical psychologist and neuropsychologist] would not be qualified to testify about [the cause of plaintiff's injury] when the neurologists and psychologists who sought out his expertise and assistance in diagnosing the disease would most likely be qualified to do so."); *Kinsey v. Kolber,* 103 Ill.App.3d 933, 59 Ill.Dec. 559, 572–573, 431 N.E.2d 1316, 1329–30 (1982); *Shilling v. Mobile Analytical Servs., Inc.,* 65 Ohio St.3d 252, 254, 602 N.E.2d 1154, 1156 (1992) (medical witness need not be medical doctor); *Sanchez v. Derby,* 230 Neb. 782, 433 N.W.2d 523, 525 (1989); *Madrid v. University of California,* 105 N.M. 715, 718, 737 P.2d 74, 77 (1987); *Weider v. Senebouthyrath,* 182 A.D.2d 1124, 583 N.Y.S.2d 94, 94 (1992). The *Fabianke* court distinguished this kind of testimony from that regarding the proper standard of care in a medical malpractice action, in which case a psychologist would be incompetent to testify. 527 So.2d at 1257. We recognized this distinction in *Tappe v. Iowa Methodist Medical Center,* 477 N.W.2d 396, 401–02 (Iowa 1991).

Other jurisdictions, however, have barred psychologists from testifying about causation of physical injuries. *See, e.g., Bilbrey v. Industrial Comm'n,* 27 Ariz.App. 473, 475, 556 P.2d 27, 29 (1976); *GIW Southern Valve Co. v. Smith,* 471 So.2d 81, 82 (Fla.App.1985) (psychologist not qualified to give opinion testimony as to whether existing brain damage was the result of a particular accident); *Chandler Exterminators, Inc. v. Morris,* 262 Ga. 257, 416 S.E.2d 277, 278 (1992). In addition to the basic theory that a psychologist lacks proper training to testify competently as to medical causation, some courts have looked to their respective statutory definitions of the practice of psychology as a basis for the restriction of such testimony. *Id.; Bilbrey,* 556 P.2d at 29.

Some courts have espoused intermediate rules. Although Florida generally bars psychologists from testifying as to the cause of organic brain injury, *Smith,* 471 So.2d at 82, two courts have allowed such testimony on harmless error grounds. *See Haas v. Seekell,* 538 So.2d 1333, 1336–37 (Fla.App.1989); *Executive Car,* 468 So.2d at 1029–30. The basic rationale in these cases was that "the disability followed the accident in an obvious sequence," thereby rendering the psychologist's testimony superfluous. *Executive Car,* 468 So.2d at 1030. A few courts that would have rejected psychological testimony supporting a brain injury have allowed it when presented in conjunction with medical testimony from a physician. *See Spann v. Bees,* 23 Md.App. 313, 327 A.2d 801, 805 (1974); *Simmons,* 331 A.2d at 898 ("When dealing with the brain, consultation with non-medical practitioners may not only be desirable but necessary."); *Karl v. Employers Ins. of Wausau,* 78 Wis.2d 284, 254 N.W.2d 255, 261 (1977). Related to this approach is the admission of psychological testimony by a party that intends to cast doubt on the opposing party's medical evidence of brain injury; such a view allows psychological testimony to refute evidence of brain injury, but not to establish it. *See Elbert County Bd. of Comm'rs v. Burnett,* 200 Ga.App. 379, 408 S.E.2d 168, 169–70 (1991); *Jacobs v. Pilgrim,* 186 Ga.App. 260, 367 S.E.2d 49, 51–52 (1988). A further variation would deem as waived any objection to psychological testimony on the issue of brain injury when the movant solicits similar testimony on its own behalf. *See Richwind Joint Venture 4 v. Brunson,* 96 Md.App. 330, 625 A.2d 326, 331 (1993).

Pennsylvania requires the psychologist testifying to brain injury to establish that his methods of examining the subject expose the cause of the injury and not merely its existence. *Simmons,* 331 A.2d at 899. Once an expert shows that he has some basis in fact for his opinion, the testimony is admissible. *Kravinsky v. Glover,* 263 Pa.Super. 8, 396 A.2d 1349, 1355 (1979).

■ Although few of these restrictions on experts strike us as fundamentally unsound, we refuse to impose barriers to expert testimony other than the basic requirements of Iowa rule of evidence 702 and those described by the Supreme Court in *Daubert.* The criteria for qualifications under rule 702—knowledge, skill, experience, training, or education—are too broad to allow distinc-

tions based on whether or not a proposed expert belongs to a particular profession or has a particular degree. *See Ganrud,* 206 N.W.2d at 315 (holding that an expert need not be a physician to give opinion testimony on the probability of loss of memory following head injury and a long period of unconsciousness).

We reject plaintiffs' contention that the restrictions of the practice of psychology in the Iowa Code or Iowa Administrative Code pose limits on the competence of psychologists to testify as experts beyond the limits in the rules of evidence. In rejecting a similar argument in *DeBurkarte,* we stated that " 'knowledge from experience is every bit as good as that acquired academically.' " 393 N.W.2d at 138 (quoting Mark McCormick, *Opinion Evidence in Iowa,* 19 Drake L.Rev. 245, 263 (1970)).

Plaintiffs' reliance on Iowa Code section 147.139, which limits expert testimony in a medical malpractice action, is similarly misplaced. Nonmedical personnel may have considerable experience with medical injuries, even though they are incompetent to testify in a medical malpractice action as to whether a physician adhered to the proper standard of care. *Fabianke,* 527 So.2d at 1257.

We understand the concern that expert testimony regarding the causes of personal injury can fall "wholly in the realm of conjecture, speculation, and surmise." *Slack v. C.L. Percival Co.,* 198 Iowa 54, 61, 199 N.W. 323, 326 (1924), *quoted in* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* 43 (1991). Nevertheless, we agree with the *Daubert* Court that the trial court in its discretion and the jury in its deliberation provide the most effective determination of the admissibility and weight of expert psychological testimony.[2]

The trial judge has the task to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. We are confident that Iowa judges have the capacity to undertake this review. *See id.*

Similarly, we believe with the aid of vigorous cross examination, the jury is fully capable of detecting the most plausible explanation of events. And, in the event that the evidence presented is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court can direct a verdict or grant summary judgment. *Id.* at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 484.

Here, ample basis existed for admission of Dr. Moore's testimony. In addition to his doctorate in clinical psychology, he has extensive postdoctoral training and professional experience. His work has focused on brain trauma treatment. He opened a head trauma rehabilitation program and as an outgrowth of this specialty he developed a head injury severity scale for application in his practice.

Moreover, plaintiffs had ample opportunity to discredit Dr. Moore. Plaintiffs' counsel subjected Dr. Moore to thorough cross examination regarding his qualifications and the basis of his testimony, placing special emphasis on his lack of medical qualifications. This strategy may not have persuaded the jury because plaintiffs relied in part on the testimony of a non-board-certified neuropsychologist as well, Dr. Bayless. *Cf. Brunson,* 625 A.2d at 331 (objection to psychological testimony waived when opponent relies on similar testimony). In any event, Dr. Moore apparently succeeded in casting enough doubt on plaintiffs' expert testimony to block plaintiffs' damages claims. *Cf. Jacobs,* 367 S.E.2d at 51–52 (allowing psychologist to testify to cast doubt on medical testimony of workers' compensation claimant).

2. Despite the posture of this case, we note that restrictions on the admissibility of expert testimony tend to tilt against the plaintiff in civil cases. *See* Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 636 (1991). Judge Weinstein stated that restrictions on the admission of expert testimony are driven by the notion "that there have been widespread abuses of the expert provisions of the Federal Rules of Evidence. There have been some abuses to be sure, but the vast bulk of cases in our courtrooms involve experts who testify sensibly and truthfully." *Id.* at 637–38.

Certainly we do not envision that everyone professing expertise on a subject should be allowed to testify in a trial. Trial judges and (to a lesser extent) appellate courts should prevent witnesses who fail to meet the rule 702 standard from giving their opinion to the trier of fact. In this case, however, we conclude that the trial court did not err in permitting a professionally trained neuropsychologist to testify as an expert as to the nonexistence of Connie's alleged head injury.

■■■ III. *Reliance on hearsay evidence.* The Hutchisons next contend that the trial court erred in admitting Dr. Moore's testimony because Dr. Moore relied on hearsay evidence in rendering his opinion regarding Connie's injuries. Although Dr. Moore did not personally examine Connie, he reviewed Dr. Bayless's neuropsychological report, Dr. Nils Varney's four reports and raw neuropsychological test data, Dr. Winthrop Risk's medical reports, Dr. Marc Hines's medical reports, Connie's diary, and her emergency room records. These reports and records were all furnished by or on behalf of plaintiffs and admitted as evidence at trial. The Hutchisons argue that Dr. Moore's exclusive reliance on this evidence rendered his expert testimony inadmissible because they contend that the evidence was hearsay.[3] Even assuming Dr. Moore relied on hearsay evidence, in forming his opinion, we reject plaintiffs' argument.

■■■ As with all evidentiary matters, the question of whether evidence underlying Dr. Moore's opinion was reasonably relied upon was for the trial court to determine in its discretion. *Brunner v. Brown,* 480 N.W.2d 33, 37 (Iowa 1992). We will disturb the trial court's determination only upon a finding of abuse. *Id.*

■■■ Iowa rule of evidence 703 provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Accordingly, an expert may rely upon hearsay evidence in giving an opinion to the jury. *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 484. The rule allows hearsay because most of the evidence experts rely on is admissible in evidence, "but only with the expenditure of substantial time in producing and examining various authenticating witnesses.... [The expert's] validation, expertly performed and subject to cross examination, ought to suffice for judicial purposes." Fed.R.Evid. 703 advisory committee's note.

The Hutchisons do not dispute that experts in the field of clinical psychology and neuropsychology rely on medical histories and records, written patient statements, test scores, and the like in forming opinions and inferences in their work. The Hutchisons' contend, however, that these facts or data are not of a type relied upon *exclusively* by such experts. They cite a leading treatise in the field that states, "For many brain damaged patients, test scores alone give relatively little information about the patient's functioning." Muriel Deutsch Lezak, *Neuropsychological Assessment* 133 (2d ed. 1983).

Nevertheless, we believe that the trial court was within its discretion in overruling this objection. Neuropsychologists certainly make written records an integral part of their analyses. Wasyliw & Cavanaugh, at 384 ("A detailed history plus access to information other than the patient's or claimant's self-report is always mandatory, no matter how clear the patient's presentation may appear."). Dr. Moore's failure to examine Connie in person went to the weight of his testimony, not its admissibility. *See Mercy Hosp. v. Hansen, Lind & Meyer, P.C.,* 456 N.W.2d 666, 671 (Iowa 1990) (observing that the burden of exploration of facts and assumptions underlying expert testimony rests on opposing counsel's cross examination).

3. Although defendant American Family did not contest plaintiffs' preservation of error on this issue, we note that in their motion in limine and at trial plaintiffs based their objections to Dr. Moore's testimony only on the ground that he was incompetent to testify, not on the ground that he based his opinion on inadmissible evidence.

IV. *Exclusion of videotape.* The Hutchisons further contend that the district court erred in refusing to allow them to introduce into evidence a videotape prepared by the Technical Medical Animation Corporation that contained a computer animated depiction of how a closed-head injury (such as the one alleged by Connie) can affect the brain. Dr. Hines, a physician testifying on behalf of the plaintiffs, offered to authenticate the videotape. American Family objected to the introduction of the videotape on the ground that Dr. Hines lacked sufficient knowledge of Connie's accident, particularly the speed, weight, and distances of the vehicles involved to authenticate it as a genuine representation of her injury. The trial court sustained the objection. We agree with the trial court's ruling.

▇▇▇ A motion picture (or a videotape) to be admissible must be authenticated, although no particular methodology is required. *State v. Deering*, 291 N.W.2d 38, 39 (Iowa 1980). A proper foundation for admission into evidence of a motion picture demands only that the fidelity of the film's portrayal be established. *Id.* at 40. This determination lies in the discretion of the trial court, *id.*, which must apply to the videotape the standards of relevance and prejudice in Iowa rules of evidence 402 and 403. *See* 2 Edward W. Cleary, *McCormick on Evidence* § 212, at 2 n. 1 (4th ed. 1992).

▇▇▇ The witness purporting to authenticate a piece of demonstrative evidence "need only know about the facts represented or the scene or objects photographed, and once this knowledge is shown he can say whether the photograph correctly and adequately portrays these facts." *Id.* § 214, at 13–14. But the treatise also warns:

A somewhat more troublesome problem is presented by posed or artificially reconstructed scenes, in which people, automobiles, and other objects are placed so as to conform to the descriptions of the original crime or collision given by the witness. When the posed photographs go no further than to portray the positions of persons and objects as reflected in the undisputed testimony, their admission has long been generally approved. Frequently, however, a posed photograph will portray only the version of the facts supported by the testimony of the proponent's witness. The dangers inherent in this situation, i.e., the tendency of the photographs unduly to emphasize certain testimony and the possibility that the jury may confuse one party's reconstruction with objective fact, have led some courts to exclude photographs of this type.

. . . .

Motion pictures, when they were first sought to be introduced in evidence, were frequently objected to and sometimes excluded on the theory that they afforded manifold opportunities for fabrication and distortion.... [I]f the foundation testimony reveals the film to be distorted in some material particular, exclusion is the proper result.

*Id.* § 214, at 16–17 (footnotes omitted).

▇▇▇ We believe the offered videotape in this case raised the "somewhat more troublesome problem" described above. The tape did not purport to re-create Connie's particular accident, yet plaintiffs hoped to use it to amplify without a factual foundation their theory that Connie's accident caused her to suffer a closed-head injury. Moreover, although Dr. Hines purported that he could authenticate the tape, he did not observe the accident or know the speeds and force involved. We believe it was well within the discretion of the trial judge to exclude the tape, which "afforded manifold opportunities for fabrication and distortion." *Id.* § 214, at 17.

In addition, the court permitted Dr. Hines to describe to the jury in detail how closed-head injuries occur. Therefore, the trial court's exclusion of the videotape did not substantially prejudice plaintiffs' rights.

V. *Limitation on voir dire.* In their last assignment of error, plaintiffs contend that the trial court erred in refusing to allow plaintiffs, during their examination of potential jurors, to refer to a study that concluded Iowans pay less in overall liability insurance premiums than residents of forty-six other states. As they stated in their offer of proof, plaintiffs hoped "to ascertain whether or not

any of the jurors had a preconceived notion about bringing claims such as we're here to litigate, personal injuries and what their feelings were." We agree with the trial court's ruling.

■ Control over voir dire is lodged in the discretion of the trial court. *State v. Windsor,* 316 N.W.2d 684, 686 (Iowa 1982). We refuse to interfere with the trial court's limitations on voir dire absent bad faith on the part of examining counsel or a manifest abuse of discretion by the trial court. *State v. Elmore,* 201 N.W.2d 443, 447 (Iowa 1972) (citing *Raines v. Wilson,* 213 Iowa 1251, 1253, 239 N.W. 36, 37 (1931)). This is especially true when the court limits voir dire to prevent counsel from injecting prejudicial matter into the minds of the jurors. *State v. Dalton,* 254 Iowa 96, 100, 116 N.W.2d 451, 453 (1962) (citing *Kaufman v. Borg,* 214 Iowa 293, 296, 242 N.W. 104, 105 (1932)).

■ Here, the disputed report itself stated that "extreme caution must be exercised in interpreting average expenditure and average premium measures.... [They] are imperfect measures of the relative 'price' of insurance across states because ... they are affected by a number of other facts." Thus, by its own terms the study had little probative value on the point for which plaintiffs offered it. Additionally, this ruling did not substantially prejudice plaintiffs' examination because they could have ascertained potential juror bias against insurance claims without referring to the study. The trial court was well within its discretion in refusing to allow plaintiffs to use or refer to the report in voir dire of the jury panel.

VI. *Disposition.* Finding no merit in any of plaintiffs' assignments of error, we affirm the judgment of the district court in all respects.

**AFFIRMED.**