**Louetta J. SMITH, an individual, and Richard L. Smith, an individual, Plaintiffs–Appellees,**

v.

**Frank H. HAUGLAND, M.D., Ph.D., an individual, and The Iowa Clinic d/b/a Heart and Vascular Care, an Iowa Corporation, Defendants–Appellants.**

No. 07–1697.

Court of Appeals of Iowa.

Feb. 4, 2009.

---

Robert Rouwenhorst of Rouwenhorst & Rouwenhorst, P.C., West Des Moines, for appellants.

Marc A. Humphrey of Humphrey Law Firm, P.C., Urbandale, for appellees.

Sara E. Thalman of Shively Law Offices, P.C., Lincoln, NE, for amicus curiae American College of Cardiology, Iowa Chapter.

Heard by SACKETT, C.J., and POTTERFIELD, J., and HUITINK, S.J.*

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2007).

POTTERFIELD, J.

The plaintiffs brought this medical malpractice action seeking damages arising from complications suffered by Louetta Smith after surgical treatment for benign premature ventricular contractions (PVCs).[1] The plaintiffs claimed the doctor failed to obtain informed consent and failed to pursue a more conservative course of treatment. These claims were supported by their expert, Dr. Kenneth Brown, a cardiologist who specialized in nuclear cardiology and had experience regarding the treatment of this benign condition. The jury found the defendants—an electrophysiologist and his medical group—negligent and awarded plaintiffs $1,628,498.04 in damages. On appeal the defendants assert the plaintiffs' expert was not qualified under Iowa Code section 147.139 (2005) to give an opinion on the specialized medical care in dispute and that their request for a new trial should have been granted.

## I. Background Facts and Proceedings.

Louetta Smith, age 76, was bothered by intermittent left-sided chest pain and occasional palpitations of her heart. She was especially concerned because her father had died of a heart attack when she was ten years old. Louetta had a fifty-year history with her family physician, Dr. Rahim Bassiri. In November 2002, on the advice of Dr. Bassiri, Louetta made an appointment with a cardiologist, Dr. Frank Haugland, to evaluate her chest pain and arrhythmias.

On November 6, Dr. Haugland wrote to Dr. Bassiri concerning his assessment and plan:

1. In lay terms, PVCs are irregular or extra heartbeats. The doctors who testified in this suit noted that many people have PVCs and

Frequent PVCs. Based on the treadmill exercise test these PVCs appear to be of right ventricular outflow tract origin. In most cases these PVCs are benign. Based on her examination today she has a fairly normal cardiac examination. I have requested a cardiac echo to be obtained to evaluate left ventricular systolic function and suspected aortic sclerosis. I have recommended a trial of low-dose Rythmol therapy starting at 75 mg by mouth twice daily. If her overall left ventricular systolic function is normal we will try to adjust the dose of Rythmol to suppress her arrhythmias and see whether or not the rest of her symptoms resolve. If there are significant abnormalities on the echo or she has persistent symptoms in spite of suppression of the PVCs I would then likely recommend that she undergo an Adenosine Cardiolite scan as she has very poor exercise tolerance during her treadmill to look for any evidence of myocardial ischemia.

On April 21, 2003, Dr. Haugland wrote to Dr. Bassiri again. Dr. Haugland noted that Louetta has been taking Rythmol, which is "less effective as time has gone by." He further noted Louetta is reporting more episodes of irregular heartbeat in association with atypical chest pain and that she is having symptoms of "palpitations, fatigue, pain in her leg, and night sweats." Dr. Haugland wrote:

Frequent PVCs of right ventricular outflow tract origin. These are no longer well controlled with Rythmol therapy. I have counseled her regarding this. She would like to have these fixed, if possible. I think it is reasonable to proceed with electrophysiology testing and radiofrequency ablation of the ectopic fo-

the majority who have them are either not aware of them or are treated by their primary care physician.

cus. It is likely that these are of right ventricular outflow tract origin. There is a small possibility that these may be actually in the left ventricular outflow tract. Regarding the testing, I discussed with her the nature of the procedure, the goals, and risks involved. She understands and agrees to proceed.

On April 24, 2003, Louetta was to undergo outpatient electrophysiology testing and radiofrequency ablation—a procedure that is designed to pinpoint the areas of the heart that are "misfiring" and uses radiofrequency energy to destroy abnormal electrical pathways in heart tissues. Unfortunately, while performing the procedure, Dr. Haugland perforated Louetta's right ventricular wall, resulting in a cardiac tamponade—the sac around the heart filled with blood and kept the heart from beating. Emergency cardiac surgery was required to repair the perforation and to drain the blood from around the heart. Louetta then developed cerebral anoxia—lack of oxygen to the brain—and suffered two strokes.

Louetta was placed in intensive care, where she stayed for eighteen days. She was taken off the ventilator about May 9, 2003. At that time medical caregivers noted she was having cognitive difficulties, including confusion, numbness and weakness to the right foot, slurred speech, and problems with coordination.

Louetta spent several more days in the hospital and then was transferred to a rehabilitation unit for sixteen days. She was discharged on June 4, 2003, and continued to receive outpatient rehabilitative services to help her to regain as much functioning as she was able.

Louetta and her husband, Richard Smith, brought this suit against Dr. Haugland and his medical group, Heart and Vascular Care, alleging negligence and loss of consortium.

Prior to trial, the defendants moved in limine to disallow, among other things, statements by plaintiffs' counsel "regarding the effect of the verdict to promote general or special deterance [sic] by using terms such as: 'punish,' 'set an example,' 'send a message' or similar language associated with punitive or exemplary damages." Plaintiffs did not resist this aspect of the motion in limine: the response reads, "[t]here is no claim for punitive damages and Plaintiffs' counsel has no intentions of using such wording in argument or otherwise."

Defendants also moved to exclude the testimony of the plaintiffs' expert witness, Dr. Kenneth Brown. Relying upon Iowa Code section 147.139,[2] the defendants contended that Dr. Brown was not qualified to testify whether radiofrequency ablation was an appropriate option for treatment because he was not an electrophysiologist and could not offer an opinion as to the standard of care of an electrophysiologist.

A hearing was held just prior to trial on the motions in limine and the motion to exclude. With respect to the motion concerning "[c]omments about the verdict as punishment," plaintiffs' counsel stated: "I don't intend to do that" and the district court sustained the motion.

With respect to the motion to exclude, defendants' counsel argued that Dr.

---

**2.** "If the standard of care given by a physician and surgeon licensed pursuant to chapter 148, or osteopathic physician and surgeon licensed pursuant to chapter 150A, or a dentist licensed pursuant to chapter 153, is at issue, the court shall only allow a person to qualify as an expert witness and to testify on the issue of the appropriate standard of care if the person's medical or dental qualifications relate directly to the medical problem or problems at issue and the type of treatment administered in the case."

Brown, a specialist in nuclear cardiology, was not a heart rhythm specialist and had never performed an ablation procedure and was thus "not qualified to express any opinion in this case as to whether Dr. Haugland was within the standard of care to give Mrs. Smith the option of a radiofrequency ablation to treat her arrhythmias." The district court overruled the motion to exclude and the case proceeded to trial.

Dr. Brown testified that he was board-certified in cardiology, "the general practice of cardiovascular medicine, cardiovascular diseases," and board-certified in the subspecialty of nuclear cardiology, which "involves the use of nuclear scans to evaluate blood flow and contraction of the heart." He testified he frequently treated patients with PVCs and for the majority of those patients, no medical treatment was recommended: simple reassurance that the extra heartbeats were benign was all that was required. For the remainder of his patients who had benign PVCs, he had successfully controlled their symptoms with medication. He testified that he did refer patients with life-threatening arrhythmias to electrophysiologists for ablation procedures.

Dr. Brown testified that Louetta's heart had no underlying abnormality and that to recommend and perform a cardiac ablation which has a known risk of serious events, including death, to someone for a condition that is completely benign without any increased risk, especially before an adequate trial of medical treatment to control any symptoms that might be related to this condition, is a deviation from good and accepted standard of care.

He testified that Louetta's chest pain was not related to the PVCs. He stated that a patient should be informed about the possible complications, the risk of death, and that chest pain would not be alleviated by the procedure. He opined that Louetta had not given informed consent to the ablation procedure.

On cross-examination, Dr. Brown acknowledged he was not involved in performing ablations. He also stated "PVCs are not generally treated by electrophysiologists, they're treated at lower levels." Dr. Brown stated, "There may be some very extenuating circumstances in which performing an ablation for symptomatic PVCs might be appropriate, but it's not this patient." He expressed no opinion as to the radiofrequency ablation technique performed by Dr. Haugland. Dr. Brown also acknowledged that eighty to ninety percent of patients who receive radiofrequency ablation experience the elimination of PVCs.

Numerous other witnesses testified that Louetta did experience chest pain and PVCs over the years. Louetta testified she had experienced sharp pains in her chest off and on for years. She went to see Dr. Haugland for the pain in her chest and she did not remember whether she also had skipped heartbeats. She testified about her father dying of a heart attack, which made her wonder about her own chest pains. She testified she believed the medication Dr. Haugland placed her on was for the "pain in my heart." She also testified Dr. Haugland was going to "[z]ap a place in [her] heart" and that she believed the ablation was to "stop some of the pain in my heart." She denied knowing about the risks of the procedure and that if she had known that her heart could have been inadvertently punctured, "I wouldn't be there." Louetta testified that, since the procedure, she was not able to clean her house; to "get the ingredients assembled" to cook; to read the newspaper, except for the headlines; to drive; or, to square dance or round dance. She described how much she missed that part of

her life with Richard. (Other witnesses supported Louetta's testimony as to the changes in her capabilities.)

On cross-examination, Louetta acknowledged that her signature and initials were on a written consent, which explained the procedure and listed the risks of cardiac catheter procedures, including cardiac perforation, bleeding at the site, infection, and in rare cases death. She testified that she did not and could not—even before the procedure—read the document.

Richard testified that he and Louetta had been married more than fifty years. He testified that as a couple they loved to travel, camp, hike, and to dance. Richard testified that Louetta periodically experienced chest pains and that she was afraid she was having a heart attack. He did not connect her occasional description of a skipped heartbeat with the chest pain. He testified that Louetta went to see Dr. Haugland because of the chest pains. As to the ablation, Richard testified that in April 2003, Dr. Haugland told him "they would go up a vein into the heart, and his term was to zap a couple of places up there and that should take care of this problem. He said it was just a-a simple outpatient process." Richard stated that Dr. Haugland told him that there was always a risk involved when you're going into the heart, but "he didn't indicate that it was anything that was life-threatening or would be anything to be too concerned about." He testified, "I figured it-if it got rid of the pain, it would be worth some risk."

Q. Did you have any understanding that this ablation procedure could cause a serious bleeding problem in Louetta's heart which might then damage her brain and affect her life forever? A. No, I was completely shocked when he reported what had happened.

Richard described Louetta's recovery efforts and her current deficits.

Dr. Haugland testified that at the time of Louetta's care there were about ten doctors in his cardiology group and he was the only electrophysiologist. In addition, there were three cardiac surgeons and four valvular surgeons. Dr. Haugland was asked, "Would you agree with me that all of the cardiologists in that group were capable of caring for and treating patients with benign PVCs like what Louetta Smith had?" He responded, "Yes."

Dr. Haugland testified that Louetta's benign PVCs were not caused by an underlying heart condition or abnormality and acknowledged that Louetta's PVCs posed no serious health threat. He agreed that greater than ninety percent of people with benign PVCs like Louetta are treated with simple reassurance by a doctor and no medication and no ablation. He testified that the risk associated with an ablation procedure was greater than the risk of the condition and that a patient should clearly understand that before going forward with the procedure. Dr. Haugland also testified that Louetta had three types of chest pain: a "noncardiac chest pain," a costochondritis [inflammation of cartilage], and a "third type of chest pain when the heart is skipping, and she can't possibly sort it out." He testified that the Rythmol prescription was to help "sort it out."

Defendants moved for a directed verdict, contending the plaintiffs had failed to provide competent evidence that Dr. Haugland's care fell below the standard of care for an electrophysiologist performing a radiofrequency ablation. The district court denied the motion, noting that the defendants missed the mark of the plaintiffs' case.

First and foremost, there is no question in this record that the ablation procedure itself fell below the standard of care.

. . .

That's not where this case pivots and to focus on that area, in this Court's view, would be inappropriate.

The criticism of Dr. Haugland is and must be temporally before the procedure itself. Clearly Dr. Brown has neither the education nor the training nor the experience of an electrophysiologist. That is not, however, his criticism, and it is not the framework in which this Court believes this case has been brought and evidentially crafted.

The thrust of the Plaintiffs' case here is and must be two-fold, as the Court views it. One, it's presented as an informed consent case, whether or not the—cardiologist who provided the modality of treatment options for the Plaintiff properly informed her of what those options were and the risks, if any, associated with them.

And the second prong of the Plaintiffs' case is, at least in this Court's view, whether or not a more conservative treatment could have been and should have been pursued before entertaining the surgical option, i.e., having used an antiarrhythmic whether or not a beta blocker or a calcium channel blocker should have been explored and used or offered before the surgical option.

. . .

It's undeniable in the record as to the education and qualifications of Dr. Brown vis-à-vis your client.

In the defendants' case-in-chief, Dr. James Hopson, a cardiologist and electrophysiologist, testified that radiofrequency ablation presents less risk than other elective surgeries, because it does not require general anesthesia, in the absence of complications. He testified that the risk of death associated with ablation is "extremely small" and the risk of perforation is about half a percent. He testified he had performed thousands of cardiac ablations during his career. When asked how many he had done for non-life threatening PVCs, he answered "[m]aybe 30." Dr. Hopson stated,

Well, my favorite treatment is nothing and reassurance, and so if patients are asymptomatic or if their symptoms are related to anxiety and their PVCs per se are not bothering them, then I often don't recommend treatment. And for patients that have distressing PVC, I will try—I'll try medicine, and I'll—I'll work at medicine along with reassurance and there are—there are three or four different medicines that are useful in-for treating PVCs, and I might try one or a different combination of the medicine. It kind of depends on the patient. And after taking PVCs that are minimally symptomatic or can be treated with reassurance to PVCs that are treated with medicine, the number that—that get to the point of thinking about an ablation is relatively small.

Dr. Hopson testified that Dr. Haugland's choice to treat Louetta with Rythmol was "excellent" and that the decision to proceed to ablation was reasonable. He testified it was appropriate to proceed with ablation, but that it "would have been perfectly appropriate not to proceed." Dr. Hopson opined Dr. Haugland had complied with the standard of care.

Dr. Haugland testified again in the defense's case, outlining his qualifications as a cardiologist and electrophysiologist. He reviewed his care of Louetta and testified he believed the ablation was reasonable under the circumstances presented by Louetta's case. He testified he did not specifically remember what he told Louetta concerning the ablation, but described his standard discussion of the procedure and the potential risks. He testified that the consent form that Louetta signed was

not his and he was not present when it was signed.

On cross-examination, Dr. Haugland acknowledged that the drug Rythmol, which he prescribed for Louetta, can potentially increase PVCs, produce shortness of breath, chest palpitations, weakness, chest pains, and anxiety. He also acknowledged that the ablation procedure he performed on Louetta was not medically necessary.

At the close of the evidence, defendants again moved for directed verdict on the ground that "Dr. Brown was not qualified to express an opinion against an electrophysiologist." The court overruled the motion noting its "assessment of the case now is as it was at the time" the court previously overruled the motion.

Discussion followed concerning the proposed jury instructions. Defendants objected to the instructions on negligence, again arguing there was no evidence that Dr. Haugland fell below the standard of care expected of an electrophysiologist. Counsel also objected to the court's statement of the case as being an overemphasis of the plaintiffs' case. The court overruled defendants' objections. First, the court found the evidence had generated a sufficient jury question. With respect to the statement of the case, the court noted:

[I]t is written in the manner that it is written for a specific reason. The—the Plaintiffs' theory in this case does not rest upon an errant ablation procedure. It rests upon the offering of that procedure, which in this instance, unfortunately, had complications. So it is the question of treatment options made available and a question of an explanation as to the risks and benefits of the treatment options which is subject to review. It's important, the Court believes, to have this statement of the case make clear that the perforation of the heart during the procedure is not the

basis of the malpractice claim, ergo it is written that way. Your objection is noted and overruled.

Closing arguments followed. At the close of his rebuttal argument, plaintiffs' counsel, Mr. Humphrey, summarized:

Folks, you've been incredibly attentive, and we appreciate the attention and the opportunity to present this case to you. It is an important case, because even though the experts come in and help you understand standards of care, it's your decision. Your decision will make a statement to this community and all of the patients—all of the many, many, many patients who have this benign PVC problem—

Mr. ROUWENHOURST: Your Honor, may we approach?

THE COURT: Sustained. Please proceed.

MR. HUMPHREY: Your decision is important to this community. It's important to Dr. Haugland, and it's important to the Smiths, and we trust that you will do the right thing. Thank you.

The jury was excused to deliberate and the alternate juror was dismissed. Defendants then moved for a mistrial based on plaintiffs' counsel's final statement. The court noted: "Just so the record is abundantly clear, you did not make a motion during the argument, you objected and I sustained the objections." The court then noted that counsel did again make a statement about the community, but that the case had been tried in a "superb fashion." The court ruled:

Based on everything that has taken place and the attentiveness that this jury has paid throughout the trial and throughout the closing arguments, this Court has confidence that they will make a decision based on the facts and based on the law and would not be

swept up in a—in a suggestion of making a—public statement. I think that was a rhetorical comment. I don't believe that it unduly prejudiced your client.

The next day the jury returned a verdict for the plaintiffs in the total amount of $1,628,698.40. For Louetta, the jury awarded: past medical expenses—$28,598.40; physical and mental pain and suffering—$200,000; physical and mental pain and suffering, future—$200,000; loss of full mind and body, past—$300,000; loss of full mind and body, future—$600,000. For Richard, the jury awarded loss of consortium, past—$150,000 and future—$150,000.

The defendants moved for a new trial, which was denied. They now appeal. They first argue that the district court erred in its ruling that Dr. Brown was qualified to testify as to the appropriate standard of care. They also contend that their motion for new trial should have been granted because plaintiffs failed to present a prima facie case, plaintiffs' counsel engaged in misconduct, and the damages were excessive.

## II. Expert Witness Qualifications.

■■■ The admission of expert testimony rests in the discretion of the district court, and we will not reverse its decision absent manifest abuse of that discretion. We are committed to a liberal rule on the admission of opinion testimony. Moreover, the source of expert knowledge is not significant, and knowledge from experience is every bit as good as that acquired academically. A physician need not be a specialist in a particular field of medicine to give an expert opinion.

*Tappe v. Iowa Methodist Med. Ctr.*, 477 N.W.2d 396, 402 (Iowa 1991) (internal quotations and citations omitted.); *see also*

*Hutchinson v. Am. Family Mut. Ins. Co.*, 514 N.W.2d 882, 886 (Iowa 1994) (finding an expert may be qualified on the basis of experience without being a recognized specialist).

■■■ Defendants assert Dr. Brown, plaintiffs' expert witness, a cardiologist with a subspecialty in nuclear cardiology, was not qualified under Iowa Code section 147.139 to give an opinion on the standard of care governing the type of treatment for benign premature ventricular contractions provided by Dr. Haugland, a cardiologist and an electrophysiologist. We disagree.

Section 147.139 provides:

If the standard of care given by a physician ... is at issue, the court shall only allow a person to qualify as an expert witness and to testify on the issue of the appropriate standard of care if the person's medical ... qualifications relate directly to the medical problem or problems at issue and the type of treatment administered in the case.

If this case had been tried on the issue of whether the ablation was negligently performed, the defendants' argument might have merit. In such a case the expert witness's medical qualifications would need to "relate directly" to the radiofrequency ablation procedure. However, that is not the case that was tried.

As the district court repeatedly clarified, the issue for the jury did not involve the manner in which the ablation was performed. Rather, the question was whether ablation was an appropriate treatment choice for Louetta's benign PVCs and whether she gave an informed consent for that treatment. An expert witness must be generally qualified in a field of expertise and must also be qualified to answer the particular question propounded. *Tappe*, 477 N.W.2d at 402. We agree with the district court that Dr. Brown was qual-

ified to answer whether ablation was an appropriate treatment choice.

Louetta's medical problem was benign PVCs. All the doctors testifying in this case agreed that benign PVCs are most often treated by a person's primary care physician. Dr. Haugland himself agreed that all of the cardiologists in his medical group were capable of caring for and treating patients with benign PVCs. Dr. Brown—a board-certified cardiologist who is also board-certified in nuclear cardiology—testified that he frequently treated patients with benign PVCs and that he had referred patients for ablation treatment. He was qualified to testify as to the appropriateness of the treatment options available to Louetta and whether she gave an informed consent to the ablation procedure. The jury was properly instructed as to the focus of their inquiry.

The district court did not abuse its discretion in allowing Dr. Brown to testify.

### III. Motion for New Trial.

 The defendants argue the district court erred in not granting their motion for a new trial based on the alleged lack of a prima facie case of negligence, misconduct by plaintiffs' counsel in closing arguments, and an award of excessive damages.

Because the sufficiency of the evidence presents a legal question, we review the trial court's ruling on this ground for the correction of errors of law. *See Estate of Long ex rel. Smith v. Broadlawns Med. Ctr.*, 656 N.W.2d 71, 88 (Iowa 2002) (stating court's review depends on grounds asserted in motion for new trial; if legal question, review is on error); *cf. Heinz v. Heinz*, 653 N.W.2d 334, 338 (Iowa 2002) (reviewing for correction of errors at law trial court's grant of directed verdict on the basis of insufficient evidence).

In addition to the grounds for granting a new trial set out in rule 1.1004(6), the trial court has inherent power to set aside a verdict when the court concludes "the verdict fails to administer substantial justice." *Lehigh Clay Prods., Ltd. v. Iowa Dep't of Transp.*, 512 N.W.2d 541, 543 (Iowa 1994). We review the court's ruling on a motion for new trial based on this ground for an abuse of discretion. *See id.* at 544. To show an abuse of discretion, the complaining party must show "the court exercised its discretion 'on grounds clearly untenable or to an extent clearly unreasonable.'" *Id.* (citation omitted). "As used in this context, '[u]nreasonable' means not based on substantial evidence." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 859 (Iowa 2001).

*Estate of Hagedorn ex rel. Hagedorn v. Peterson*, 690 N.W.2d 84, 87–88 (Iowa 2004).

Defendants' assertions concerning the lack of a prima facie case are grounded upon their belief that Dr. Brown was not qualified to testify as to the standard of care. We have already rejected that contention and need not address it further.

 Defendants next assert that plaintiffs' counsel's statements during closing argument regarding the importance of the case to the community constituted prejudicial misconduct requiring a new trial. A new trial is required for improper conduct by counsel if it appears that prejudice resulted or a different result would have been probable but for any misconduct. *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 178 (Iowa 1990). Trial courts have considerable discretion in determining whether any alleged misconduct was prejudicial. *McGough v. Gabus*, 526 N.W.2d 328, 333 (Iowa 1995).

Here, the district court ruled that the motion for mistrial came too late as it was not made until after the jury began deliberations. See *Rosenberger Enters., Inc. v. Ins. Serv. Corp. of Iowa,* 541 N.W.2d 904, 907 (Iowa Ct.App.1995). It also noted that defendants did not ask for a curative instruction.

Even if we assume that defendants did not waive this error, we do not find counsel's argument so impassioned and inflammatory that it likely caused prejudice. *See, e.g., id.* at 908 (finding a new trial should have been granted because the "cumulative effect of Rosenberger's counsel's closing argument was an impassioned and inflammatory speech that likely caused severe prejudice" where counsel argued that the jury should find fault on the basis of ability to pay rather than actual fault, used melodramatic antics throughout final arguments, and impermissively asserted his personal opinion). We again find no abuse of discretion.

■ Lastly, defendants assert that they are entitled to a new trial because the damages awarded were excessive. An award that is flagrantly excessive or unsupported by the evidence may be set aside or altered on appeal. *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 659 (Iowa 1969).

■ The jury awarded more than $1.6 million to the plaintiffs. The defendants contend this award was excessive and without evidentiary support, noting the advanced age of the plaintiffs. The district court found that the record did not support a finding that the awards were a product of emotion rather than reason.

The jury's charge was to decide the amount of damages that would compensate Louetta fairly for the resulting pain, disability, and mental anguish, and Richard for loss of consortium. From the evidence presented, the jury could conclude that prior to the April 2003 procedure, there was no underlying heart disease related to Louetta's PVCs. Prior to the procedure, Louetta and Richard led a very full life. They enjoyed dancing several times a week, including square dancing and round dancing, both of which require that the participants be able to hear and process dance calls. Louetta insisted on keeping a clean house and enjoyed cooking and reading. After the procedure, Louetta struggled through many months of difficult rehabilitative effort, but was still unable to regain many capabilities she previously possessed. Among other things, she did not drive; she could not process information sufficiently to cook; she was unable to square dance; reading was difficult. Richard helped her through this difficult time and had been required to take over many of the day-to-day chores. Their social life was substantially diminished. The district court noted that "there was unquestionably evidence of great loss in the waning years of life. Indeed, because it is short, it may be more precious. Remittitur on this ground would not be justified."

The district court concluded that the amount awarded by the jury was supported by the evidence and that no remittitur was warranted. We give weight to the district court's refusal to grant a new trial based on the same grounds the defendants urge here. *See id.* at 660. The verdict in this case, although large, does not shock the conscience or go beyond the evidence. We are not willing to disturb the finding of the jury.

**AFFIRMED.**