STATE of Iowa, Appellee,

v.

Brandon SAYLES, Appellant.

No. 02–0541.

Supreme Court of Iowa.

May 7, 2003.

Linda Del Gallo, State Appellate Defender, and James G. Tomka, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Cristen C. Odell, Assistant Attorney General, John P. Sarcone, County Attorney, and Steve Foritano and John Judisch, Assistant County Attorneys, for appellee.

TERNUS, Justice.

The defendant, Brandon Sayles, asserts the district court erred in admitting computer-generated animated slides depicting shaken baby syndrome as evidence in his trial for child endangerment. We conclude the trial court did not abuse its discretion in admitting this demonstrative evidence. We also find no merit in the defendant's claim he was entitled to a judgment of acquittal based on an alleged insufficiency of the evidence. Accordingly, we affirm the judgment of conviction and sentence entered upon the charge of child endangerment causing serious injury.

## I. Background Facts and Proceedings.

This case arose from the tragic abuse of a two-month-old baby, Adaym Sayles, who was brought to the hospital on Monday, August 20, 2001, suffering from seizures, difficulty breathing, and lethargy. The attending pediatric physician, Dr. Karen Gerdes, determined Adaym had recently been intentionally vigorously shaken, causing bleeding in the brain and in the lining of the back of the eyes. This intentional trauma, labeled shaken baby syndrome by Dr. Gerdes, resulted in permanent injuries to Adaym, including blindness and weakness in his right side.

The defendant, Adaym's father, was charged with child endangerment causing serious injury. See Iowa Code § 726.6(1), (2) (2001). A jury found him guilty of this charge and the court sentenced him to ten years imprisonment. This appeal followed.

On appeal, Sayles raises two issues. First, he claims the court should have granted his motion for judgment of acquittal based on the insufficiency of the evidence showing he was the perpetrator of the abuse suffered by his son.[1] Second, he asserts the court abused its discretion in admitting computer-generated animated slides showing the mechanism of injury to children hurt by violent shaking. We first address his sufficiency-of-the-evidence claim.

## II. Sufficiency of the Evidence to Identify the Defendant as the Perpetrator.

A. *Scope of review.* We will affirm the denial of a motion for judgment of acquittal if substantial evidence in the record supports each element of the offense challenged by the defendant. *State v. Anderson*, 618 N.W.2d 369, 372 (Iowa 2000); *State v. Westeen*, 591 N.W.2d 203, 206 (Iowa 1999). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *State v. Webb*, 648 N.W.2d 72, 75–76 (Iowa 2002). In making this assessment, we consider all the evidence, and we view it in the light most favorable to the State. *See State v. Laffey*, 600 N.W.2d 57, 59 (Iowa 1999).

B. *Parties' contentions.* "The State must prove every fact necessary to constitute the crime with which the defendant is charged." *Webb*, 648 N.W.2d at 76. Here, the jury was instructed that the prosecution had to prove, among other things, that the defendant "knowingly acted in a manner creating a substantial risk to Adaym Sayles' physical, mental, emotional health or safety" or "intentionally used unreasonable force, torture or cruelty that resulted in physical injury to Adaym Sayles." The defendant does not dispute that his son was the victim of shaken baby syndrome, but he does claim the evidence cannot support a finding that he inflicted that abuse.

Specifically, Sayles argues that Adaym was not in his exclusive care during the time period when the infant's injuries most likely occurred. The defendant claims that at least four other persons had care and control of the child during some portion of this window of time and, therefore,

---

1. The defendant also contends in his brief that the evidence was insufficient to establish that if he did cause Adaym's injuries, he acted knowingly or intentionally in doing so. *See* Iowa Code § 726.6(1)(*a*), (*b*). Because he does not support this contention with any argument or citation of authority, we do not address this issue. *See In re Detention of Garren*, 620 N.W.2d 275, 285 (Iowa 2000) (stating failure to argue or cite authority in support of issue may be deemed a waiver of that issue); Iowa R.App. P. 6.14(1)(*c*) (same).

the State has failed to prove beyond a reasonable doubt that he is responsible for Adaym's injuries. The State responds that its witnesses systematically eliminated any other person as the culprit.

■ In evaluating the legitimacy of the parties' arguments, we note that direct and circumstantial evidence are equally probative. *See* Iowa R.App. P. 6.14(6)(*p* ). In fact, it is possible for a verdict to rest on circumstantial evidence alone. *State v. Moses,* 320 N.W.2d 581, 586 (Iowa 1982).

C. *Evidence introduced at trial.* Turning to the record in this case, we summarize the evidence presented to the jury. Adaym had been ill with a virus in the week prior to his hospitalization on Monday, August 20, 2001. His mother, Amanda Sayles, had taken him to the doctor on Tuesday, August 14, and the doctor who examined Adaym characterized the child as a "normal, happy, healthy, two-month-old baby" suffering the early effects of a viral infection. A day care worker who cared for Adaym on Friday, August 17, testified the baby appeared tired and a little more fussy than normal that day, but she had no concerns about his condition. He was described as playful on Friday, and there was no evidence the child was injured at day care that week.

Adaym and his brother and sister stayed overnight with their maternal grandparents on Friday night. Although Adaym was up quite a bit during the night, he usually did not sleep through the night even when feeling well. On Saturday morning, Adaym was in the care of his uncle, Amanda's brother, for about an hour and a half, while the grandparents were occupied with other activities. During this time, the child took his bottle without difficulty and lay in his rocker, content and looking around the room while his uncle and siblings watched television. Adaym's grandparents and his uncle testified that Adaym was not injured while in their care. Although Adaym was sometimes fussy during this time, he was generally alert and active.

About noon on Saturday, August 18, the children were returned to Amanda's care. Although Adaym was fussy all day, Amanda was not overly worried; she thought he might still have had a slight fever. That night—Saturday night—Adaym was "up all night," even though he would typically sleep for five or six hours at a time.

On Sunday, Amanda cared for the baby until she went to work. She fed Adaym a bottle at 2:15 p.m., just before leaving. She recalled the baby "wasn't fussy," appeared "satisfied," and smiled at her. Adaym and his siblings were left in the care of the defendant while Amanda was at work.

Amanda returned home around 11:30 p.m. She was surprised to find Adaym in his crib since he usually slept in his baby swing. The defendant asked his wife to "please not wake the baby" because he had just gotten Adaym to sleep. Despite the defendant's request, Amanda went into the bedroom, picked up the baby, and began talking to him. She immediately noticed something was wrong. Adaym "looked sick" and was very limp. Amanda asked her husband "what happened," and he told her the baby had been like that all night. According to Amanda, Adaym was significantly worse than he was when she left for work.

Amanda took the baby out to the living room to check him over. He was "whiney like something hurt." She attempted to give him Motrin®, but he spit it out. Eventually the baby took some milk. Sayles went to bed, but Amanda kept Adaym with her on the sofa all night.

Amanda testified the baby did not wake up all night. In the morning, he still was

not acting normally and would not eat. Amanda called the visiting nurse, reporting to her that the baby had "some jerking on his right side." Suspecting seizures, the nurse said she would come over. While the nurse was en route, Amanda called the family doctor. His records show this call was placed about noon on Monday, August 20, 2001. The records state the child's mother reported the baby had some twitching in his hands, that she was concerned about seizures, and that the twitching had started on Sunday evening. When the visiting nurse arrived, she determined the baby was having seizures, and so Amanda called 911. According to the nurse, Amanda told her the baby had not eaten since 3:00 a.m., and had been having seizure-like activity "since yesterday."

By the time the paramedics arrived, the child was laying limply on the couch. The paramedic reported the parents told him the baby had been sick that week with a viral infection, had been acting and eating normally on Sunday evening, and had seizures on Monday morning prior to the 911 call. The parents also told the paramedics that the baby had not fallen or sustained any trauma.

Adaym was transported by ambulance to the hospital. Amanda rode in the ambulance and carried the baby into the hospital herself. By this time Adaym was having difficulty breathing and was put on a ventilator. He continued to have seizures, requiring an increasing amount of medication to control them. A CAT scan of his brain revealed several hemorrhages. Although the medical personnel were able to save Adaym's life, he sustained permanent injuries, as indicated earlier, including blindness and weakness in his right side.

Several medical witnesses testified at trial. The treating physician, Dr. Gerdes, believed the baby had been subjected to abusive head trauma, otherwise known as shaken baby syndrome. With the help of computer-generated animation, she explained that when an infant is shaken vigorously its head is whipped back and forth, causing bleeding in the brain, damage to the nerves of the brain, swelling of the brain, and bruising and bleeding in the back of the eyes. Adaym had all of these injuries.

Dr. Gerdes further testified that an infant sustaining the injuries exhibited by Adaym "would become symptomatic immediately upon being shaken." He might have been sleepy or lethargic; he could have started having seizures; he could even have lost consciousness for a while. It was her opinion that the baby was shaken on Sunday night, shortly before the parents "noted him having the seizure at 11 o'clock at night." Although she conceded on cross-examination that in some cases symptoms may not begin for twenty-four hours and that parents may not recognize seizures, she said that in view of the severity of Adaym's injuries, if he had been injured at noon on Sunday, he would most likely have died by noon on Monday. In her opinion, the shaking that caused Adaym's injuries was very severe and life threatening in nature and the baby's seizures would have begun almost immediately. She said the injuries could not be attributed to an accident.

A neuroradiologist who testified for the State said the injuries he saw on the CAT scan and a subsequent MRI would most likely have been inflicted within the last twenty-four to thirty-six hours prior to the tests. Although he admitted there was a "chance" they occurred up to seventy-two hours prior to testing, he asserted clinical information would be necessary to more accurately pin down the time of injury.

A hospital pediatric social worker and the emergency room nurse testified

Adaym's parents told them they had noticed some twitching on Sunday night. The nurse recalled the defendant stating more than once during their conversation that he hoped one of the other children had not done something to the baby.

Two ophthalmologists who treated Adaym also testified. One of these doctors told the jury the retinal bleeding he observed was as extensive as he had ever seen. Both ophthalmologists agreed that the infant's injuries were caused by violent shaking and, based on the severity of the bleeding, Adaym would not have behaved normally after the shaking and would have immediately been blind or had very great difficulty seeing. One ophthalmologist, Dr. Jean Spencer, testified the baby's injuries could have happened very shortly before he was brought to the hospital or up to twenty-four to forty-eight hours earlier. She stated if the baby appeared to have vision and was visually responsive on the prior day, that would suggest the injury had not yet occurred.

Dr. Spencer also testified she spoke with the parents after she had examined the baby at the hospital. She told the parents that the baby's condition was very severe and she was concerned that he would be blind. Adaym's mother, Amanda, was tearful and concerned; in contrast, the defendant did not focus on the baby's condition, but volunteered that he did not shake his child.

A police officer that interviewed the parents at the hospital also testified at trial. He said the defendant told him Adaym was "fine" when Amanda left for work, although the baby was fussy and tired. The defendant further stated the first time he saw Adaym "tremoring" was after Amanda returned home, although it could have been the week before. When asked by the officer if he knew how the baby might have been injured, the defendant offered that the child "may have fallen off a bed or a couch or that his siblings ... could have hit him over the head with a toy or could have pushed him too hard in his swing."

A pediatric forensic pathologist testifying on the defendant's behalf agreed with the prosecution's witnesses that Adaym suffered from shaken baby syndrome. She conceded the injuries suffered by the child could not have resulted from a short fall, being hit on the head with a toy by another child, or being pushed too hard in a swing. Based upon her examination of the medical records, the defendant's expert witness concluded Adaym's injuries were not life threatening, and that the seizure medication administered at the hospital contributed to his breathing difficulties and lethargy. As a result, she thought it was difficult to pinpoint exactly when the child's injuries were inflicted and, in her opinion, it was possible they had occurred up to seventy-two hours prior to the child being brought to the hospital.

D. *Analysis.* As noted earlier, the defendant claims at least four other persons cared for Adaym during the critical time period and they were just as likely responsible for the baby's injuries as was the defendant. It is true there was evidence setting the time of Adaym's injuries up to seventy-two hours prior to noon on Monday, thereby placing Adaym in the care of his maternal grandparents, uncle and mother, as well as the defendant, during the critical time period. It is not true, however, that the evidence showed one of these other individuals was just as likely as the defendant to be the perpetrator.

There was substantial evidence from those who saw the baby in the days before his hospitalization that he was alert, albeit fussy, until Amanda noticed a marked change in his condition when she returned from work on Sunday night. Even the

defendant himself told the investigating officer that the baby was "fine" when Amanda left for work. At least three doctors who cared for the infant testified that he would not have been fine if the shaking incident had already occurred. Rather, the child would have immediately exhibited symptoms of shaken baby syndrome. The circumstantial evidence clearly points to the injury occurring while Amanda was at work and the baby was exclusively in the defendant's care. Added to the medical evidence are the defendant's unsolicited denial of responsibility and suggestion of innocuous causes as the source of Adaym's injuries. This conduct also points to the defendant as the culprit. *See State v. Turner,* 630 N.W.2d 601, 609 (Iowa 2001) (stating defendant's volunteered statements indicating other people might be responsible for criminal act may indicate a "consciousness of guilt"); *State v. Cox,* 500 N.W.2d 23, 25 (Iowa 1993) (stating a defendant's conduct subsequent to a crime can be an implied admission "when such conduct indicates a consciousness of guilt").

Viewing the evidence in a light most favorable to the State, we think there was substantial evidence from which a fact finder could conclude beyond a reasonable doubt that the defendant inflicted the severe injuries sustained by his son. As a result, we hold the trial court did not err in refusing to grant the defendant's motion for judgment of acquittal.

III. *Admissibility of Computer–Generated Animated Slides of Shaken Baby Syndrome.*

A. *Challenged evidence.* Prior to trial, the State revealed it intended to use a computer presentation containing some animated slides for demonstrative purposes during the testimony of Dr. Gerdes. At a hearing on the defendant's motion in limine to exclude this evidence, the State

explained that the slides had been prepared by the National Center on Shaken Baby Syndrome; they would be used by Dr. Gerdes to assist her "in explaining [her] testimony to the jury"; and the audio narration prepared by the Center would not be played. The defendant objected on two grounds: (1) lack of foundation, specifically, authentication; and (2) the unfair prejudice of the evidence outweighed its probative value. The court made a preliminary ruling it would allow the State to show eight of the nineteen slides.

The defendant renewed his objections to the evidence at trial, focusing specifically on the slide depicting how a shaken baby injury occurs. This particular slide contained an animated baby being shaken by adult arms; the animation lasted approximately eight seconds.

Dr. Gerdes testified at trial that the slides accurately and fairly depicted the mechanism of shaken baby syndrome and the effects of such shaking. Based on her testimony, the court concluded the slides were properly authenticated. It then turned to the defendant's second objection, carefully considering the prejudicial impact of the slides as well as their probative value. The court decided that with a cautionary instruction the slides were not unfairly prejudicial and ruled that they would be admitted. Prior to the slides being shown to the jury, the court gave the following instruction:

Ladies and Gentlemen, we're going to watch an exhibit, portions of which are animated, and I want you to understand this is not meant to be a recreation of any events in this case. It's merely a computer picture which is designed to help you understand this witness['s] opinions and to reinforce their point.

I want you to understand that the computer-generated animation here is not an exact recreation of what may or

may not have happened to the child at issue in this case. It is merely an illustration so that you may better understand the concepts we are discussing here and the testimony of this witness.

Dr. Gerdes then explained to the jury what the slides illustrated. With respect to the slide found most objectionable by the defendant, the witness stated:

What they're trying to demonstrate here is that infants are usually shaken by placing the hands around their upper arms or around their chest and then they're shaken very vigorously so that the head gets basically whipped forward and backwards, whipped forward enough that the chin actually touches the chest and then backwards enough that the back of the head actually touches the very back of their back, their backbone.

The doctor then described what the other slides depicted with respect to the physical changes that occur in the blood vessels and nerves located in the brain and eyes of a child who has been shaken in this manner.

At the close of the evidence and prior to submitting the case to the jury, the court gave another cautionary instruction that was substantially the same as the oral instruction given prior to Dr. Gerdes's testimony and the playing of the slide presentation. The jury did not view this exhibit during its deliberations. It is upon this record that we examine the defendant's claim the court abused its discretion in admitting this demonstrative evidence.

B. *Scope of review.* "Admission or exclusion of demonstrative evidence rests largely within the trial court's discretion." *State v. Thornton,* 498 N.W.2d 670, 674 (Iowa 1993). Therefore, our review is for an abuse of discretion. *Hutchison v. Am. Family Mut. Ins. Co.,* 514 N.W.2d 882, 885 (Iowa 1994).

"An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' 'A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law.' " *State v. Rodriquez,* 636 N.W.2d 234, 239 (Iowa 2001) (citations omitted). "Even if an abuse of discretion is found, reversal is not required unless prejudice is shown." *State v. Buenaventura,* 660 N.W.2d 38, 50 (Iowa 2003).

C. *Foundation.* We first consider the defendant's contention that the prosecution did not establish a proper foundation for admission of the slides. The requirements for authentication of an exhibit are contained in Iowa Rule of Evidence 5.901, which provides in pertinent part:

*a. General provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

*b. Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) *Testimony of witness with knowledge.* Testimony that a matter is what it is claimed to be.

Iowa R. Evid. 5.901. This court has stated that a witness who authenticates demonstrative evidence " 'need only know about the facts represented or the scene or objects photographed, and once this knowledge is shown he can say whether the [exhibit] correctly and adequately portrays these facts.' " *Hutchison,* 514 N.W.2d at 890 (quoting 2 John W. Strong, *McCor-*

*mick on Evidence* § 214, at 13–14 (4th ed.1992)).

The defendant argues the foundation here was inadequate because the State did not have an eyewitness to or video of the actual shaking of Adaym so as to permit Dr. Gerdes to state that the slides were a fair demonstration of the shaking event in this case. Consequently, contends the defendant, the exhibit offered by the prosecution could not illustrate either the degree of force or the number of oscillations required to cause the injuries sustained by this child.

The defendant relies on our *Hutchison* decision, where this court upheld the trial court's refusal to admit, for lack of authentication, a videotape that illustrated how a closed-head injury occurs and how it affects the brain. *Id.* In that case, the plaintiff claimed she sustained a closed-head injury in an automobile accident. *Id.* at 884. She offered the testimony of her expert witness, a physician, to authenticate the computer-animated videotape. *Id.* at 890. We gave the following explanation of our decision affirming the district court's rejection of this evidence:

> The tape did not purport to re-create Connie's [the injured plaintiff] particular accident, yet plaintiffs hoped to use it to amplify without a factual foundation their theory that Connie's accident caused her to suffer a closed-head injury. Moreover, although [the expert witness] purported that he could authenticate the tape, he did not observe the accident or know the speeds and force involved. We believe it was well within the discretion of the trial judge to exclude the tape, which "afforded manifold opportunities for fabrication and distortion."

*Id.* (emphasis added) (citation omitted).

██ The defendant's challenge here to the State's authentication of the challenged slides, and to some extent our own decision in *Hutchison,* overlook the distinction between demonstrative evidence purporting to re-create an event and similar evidence that merely illustrates a witness's testimony. *See, e.g., Hinkle v. City of Clarksburg,* 81 F.3d 416, 425 (4th Cir.1996); *People v. Cauley,* 32 P.3d 602, 606–07 (Colo.Ct.App. 2001). One court has helpfully described the distinction in this way:

> Computer generated evidence is an increasingly common form of demonstrative evidence. If the purpose of the computer evidence is to illustrate and explain a witness's testimony, courts usually refer to the evidence as an animation. In contrast, a simulation is based on scientific or physical principles and data entered into a computer, which is programmed to analyze the data and draw a conclusion from it, and courts generally require proof to show the validity of the science before the simulation evidence is admitted.

*State v. Farner,* 66 S.W.3d 188, 208 (Tenn. 2001); *accord Pierce v. State,* 718 So.2d 806, 808 (Fla.Dist.Ct.App.1997). Thus, the classification of a computer-generated exhibit as a simulation or an animation also affects the evidentiary foundation required for its admission. *Commonwealth v. Serge,* 58 Pa. D. & C. 4th 52, 70–71 (Ct. C.P.2001); *Farner,* 66 S.W.3d at 208.

With this distinction in mind, we turn now to the foundation offered by the State in this case. Through questioning of Dr. Gerdes, the prosecution established the doctor knew of the facts represented by the slide presentation and, in addition, was able to positively state that the slides correctly and adequately portrayed those facts. We agree with the district court that this testimony was adequate to authenticate the exhibit for use as illustrative evidence. Dr. Gerdes's lack of knowledge of the exact force used to inflict Adaym's

injuries does not preclude authentication of the exhibit for this limited purpose.

■ C. *Unfair prejudice.* Although the defendant concedes the slide presentation was relevant evidence, he challenges its admission on the basis that it was unfairly prejudicial. Under our rules of evidence, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Iowa R. Evid. 5.403. We recently defined the elements weighed in the balancing process required by this rule:

> " '[P]robative value' gauges the strength and force of" the evidence "to make a consequential fact more or less probable." Unfairly prejudicial evidence is evidence that
>
>> "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case."

*Rodriquez,* 636 N.W.2d at 240 (citations omitted).

Although our discussion in *Hutchison* was couched in terms of authenticity, our focus was in reality on the risks and benefits of admitting such evidence. In that case, the trial court and our court on appeal were concerned with the problems arising when a posed or artificially reconstructed scene portrays only one party's version of the relevant event. *Hutchison,* 514 N.W.2d at 890. There, although the plaintiffs contended the videotape was not a re-creation of the accident, causation was a disputed issue and, more importantly, the court was justifiably concerned that the videotape would be used to "amplify *without a factual foundation*" the plaintiffs' theory of the case. *Id.* (emphasis added). In essence, we properly concluded the trial court did not abuse its discretion because any probative value of the evidence was outweighed by the danger of misleading the jury. *See Clark v. Cantrell,* 339 S.C. 369, 529 S.E.2d 528, 538 (2000) (affirming trial court's refusal to admit video animation of how accident occurred as demonstrative evidence, concluding the probative value did not outweigh "the danger of unfair prejudice and misleading the jury due to the inaccuracies" in the video compared to the proponent's testimony).

Another case upon which the defendant relies rejected demonstrative evidence for similar reasons. In *United States v. Gaskell,* 985 F.2d 1056 (11th Cir.1993), the appellate court reviewed the trial court's allowance of a demonstration of shaken baby syndrome performed by a witness using a doll. 985 F.2d at 1060. In that case, the defendant claimed he inflicted injuries on a seven-month-old child "in a panicked attempt to revive her." *Id.* at 1061. The court noted "the outcome of the trial hinged upon whether the jury believed that the degree of injury suffered" by the child could have resulted from the amount of force the defendant claimed he used. *Id.* The problem in the demonstration was that "due to differences in the weight of the doll's head as well as the flexibility and length of the doll's neck, a considerably greater degree of force was required in order to produce the head movement characteristic of shaken baby syndrome" than what would actually be required to inflict the child's fatal injuries. *Id.* at 1060. Consequently, the demonstration did not afford a fair comparison and "tended to implant a vision of [the defendant's] actions in the jurors' minds that was not supported by any factual basis." *Id.* at 1061. Accordingly, the court concluded the slight probative value of the

demonstration was overwhelmed by its unfairly prejudicial effects. *Id.* at 1060.

The present case is distinguishable from both *Hutchison* and *Gaskell* because the relevant factors in the present case are critically different. Here, there was no dispute about causation or the mechanism of injury; all parties agreed Adaym's injuries were caused by a severe shaking. Consequently, unlike the cases cited by the defendant, there was no risk in the case before us that the jury would be misled into believing the injury occurred in a manner that was not factually supported by the record.

The trial court recognized this distinguishing feature in deciding to admit the computer-generated exhibit here, noting in its ruling that the challenged evidence did not favor one party's version of how the injury occurred. In addition to this critical fact, the trial court also properly considered the nature of the demonstration portrayed in the slide. The animation was not overly dramatic. It was clinical in nature and the computer-generated infant showed no facial expression and emitted no sound during the shaking. *See People v. Hood*, 53 Cal.App.4th 965, 62 Cal. Rptr.2d 137, 141 (1997) (concluding animation that was clinical and emotionless did not "prey on the emotions of the jury," and its probative value was not outweighed by any prejudicial impact); *Pierce*, 718 So.2d at 810 (finding no abuse of discretion in admission of computer-generated animation of accident where no blood was shown, no sound was replicated, and mannequins used in demonstration had no facial expressions). Based on these considerations, the court reasonably concluded that any prejudice from the visual depiction of shaken baby syndrome was only that inherent in any unfavorable evidence and,

consequently, such prejudice was not unfair. Turning to the other side of the equation—probative value, the court observed the animated slides would be helpful to the jury in understanding the witness's explanation of how shaking could cause such severe injuries to an infant. *See generally State v. Stewart*, 643 N.W.2d 281, 294 (Minn.2002) ("Visual aids are relevant if they assist the jury in understanding a witness's testimony."). Finally, the court gave a cautionary instruction both before and after the evidence was shown to the jury informing the jurors that the exhibit did not purport to re-create the crime at issue in this case. Thus, not only did the court reasonably balance any unfair prejudice against the probative value of the evidence as required by rule 5.403, it minimized any prejudice by admonishing the jury not to make more of the evidence than what it professed to be—a mere illustration of the witness's testimony.

In conclusion, we think the trial court properly applied the law and made reasonable judgments that enjoyed support in the record in ruling that the slide presentation was admissible. Therefore, the trial court did not abuse its discretion in allowing the jury to view this demonstrative evidence. *See Cauley*, 32 P.3d at 608 (finding no abuse of discretion in admission of video animation of how injuries are caused by shaking of baby).

Finding no reversible error, we affirm.

**AFFIRMED.**