# IN THE COURT OF APPEALS OF IOWA

No. 14-0218
Filed May 20, 2015

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**JOSEPH EDWARD ALBERT OLEA,**
     Defendant-Appellant.
_____

     Appeal from the Iowa District Court for Jasper County, Randy V. Hefner,

Judge.


     Joseph Olea appeals from his conviction for child endangerment causing

death.  **CONVICTION AFFIRMED; SENTENCE VACATED IN PART AND**

**REMANDED.**


     Mark C. Smith, State Appellate Defender, and Theresa R. Wilson,

Assistant Appellate Defender, for appellant.

     Thomas J. Miller, Attorney General, Heather R. Quick (until withdrawal)

and Kevin Cmelik, Assistant Attorneys General, Mike Jacobsen, County Attorney,

and Scott Nicholson, Assistant County Attorney, for appellee.


     Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, P.J.**

Joseph Olea appeals from his conviction for child endangerment causing the death of his child, K.O. He asserts the evidence was insufficient to support the jury's guilty verdict and that the district court imposed an illegal sentence when it ordered him to pay the costs of the child's autopsy, asserting it did not have the statutory authority to do so. He further argues the presence of a thirteenth juror—assumedly—during deliberations violated his due process rights. We conclude sufficient evidence supports Olea's conviction, given the many experts who testified that K.O.'s cause of death was shaken baby syndrome and Olea was the only one present during the timeframe in which the injury occurred. However, we agree with his claim the district court imposed an illegal sentence when it ordered him to pay the costs of K.O.'s autopsy, as it did not have the statutory authority to do so. With regard to Olea's assertion his constitutional rights were violated when a thirteenth juror was perhaps present for deliberations, the record is inadequate to address this claim, and therefore we preserve this claim for possible postconviction relief proceedings. Consequently, we affirm Olea's conviction but vacate the portion of his sentence requiring him to pay the costs of K.O.'s autopsy and remand for entry of a corrected sentencing order consistent with this ruling.

**I. Factual and Procedural Background**

Olea was the father of K.O., who was six months old at the time of his death. K.O.'s last medical appointment on January 9, 2012, established he was healthy. Olea and K.O.'s mother, Chelsea Miller, lived together with K.O. On January 10, 2012, Miller woke about 5:00 a.m. and peeked in on K.O. before

leaving for work, entrusting K.O.'s care to Olea. At trial, Miller testified K.O. was not fussier than normal the night before and that he took his nighttime bottle appropriately.

At trial, Olea testified K.O. was fussier than normal on the days leading up to his death. He also stated K.O. did not take his first bottle on January 10 and that he noticed K.O. was arching his back and sticking out his stomach when he first woke up. This differed from Olea's statements to Officers Wayne Winchell and Wesley Breckenridge on January 11 and 12. In a recorded interview admitted into evidence, he stated K.O. woke up between 7:30 and 8:00 a.m., drank his bottle, and the two went back to sleep. Upon waking, Olea noticed K.O. was fussy, arching his back, sticking out his stomach, and had a fever.

Olea gave K.O. infant Tylenol early that morning, which broke his fever. Miller called Olea at her mid-morning break, and Olea informed her K.O. was not feeling well. K.O. took his second bottle slowly but then vomited, throwing up a total of four times that morning. Miller called Olea during her lunch break and Olea told her K.O. had vomited. Miller stated Olea should call the doctor if necessary, though Olea did not do so. Miller also called Olea during her afternoon break, at which time Olea informed her K.O. was arching his back. When Miller came home at approximately 3:30 p.m. K.O. appeared very ill—his body was flimsy, he was not breathing well, and his eyes were dark. She and Olea took him to the hospital, where the doctors gave him oxygen and intubated him.

Due to the severity of his condition, K.O. was LifeFlighted to Blank Children's Hospital in Des Moines. Following a C.T. scan, the pediatric intensive

4

care physician concluded K.O. suffered a severe brain injury. K.O.'s symptoms included extensive retinal hemorrhaging, retinal folds, and retinoschisis cavities in his eyes, as well as bleeding, swelling, and lack of oxygen in the brain. Given these symptoms, all subsequent examining physicians concluded his injuries were due to abusive head trauma. On January 15, K.O. was declared brain dead and was taken off life support.

While at the hospital, prior to K.O.'s death, Olea was very agitated. He expressed a great deal of anger, yelled at the staff, and was defensive when doctors inquired as to what had happened to K.O. The staff called security in response to Olea's behavior. He also told Miller that he did not want "her f***ing mother there," and stated: "You guys are all going to think I did something." He further informed Miller he did not want her talking to anyone outside his presence and would not leave her alone, including sitting in the bathroom when she was showering at the hospital. Additionally, Olea stood over K.O.'s bed crying and stating multiple times "I'm sorry [K.O.]." At trial, Miller testified Olea had recently lost his job and they fought nearly daily, primarily about Olea finding other employment. She further stated Olea had been jealous in the past because Miller seemed to love K.O. more than she loved Olea and expressed more affection towards him than Olea.

An autopsy on K.O.'s body was performed by Michelle Catellier, M.D., associate medical examiner for the State of Iowa. She ruled out a variety of causes to his death including meningitis, brain infection, spinal cord infection, metabolic deficiencies, bacterial infections, and cortical vein thrombosis. She further observed three bruises on K.O.'s scalp, redness in other areas on his

head, and bruises on both sides of his ribs. Due to these observations, as well as the bleeding in the back of his neck and in the muscles, Dr. Catellier concluded K.O. died from blunt force injury to the head and neck, caused by a blow or rapid movement.

On August 6, 2012, Olea was charged with first-degree murder, in violation of Iowa Code sections 707.1 and 707.2(5) (2011), as well as the lesser-included offense of child endangerment causing death, in violation of sections 726.6(1)(b), 726.6(3), and 726.6(4). A jury trial was held from January 21 to January 28, 2014, after which the jury returned a verdict of guilty to the charge of child endangerment causing death.

There were several medical experts who testified at trial, including both treating physicians—Tracy Ekhardt, M.D., and Kenneth McCann, M.D.—as well as forensic experts Jean Spencer, M.D., Nasreen Syed, M.D., Dr. Catellier, and Patricia Kirby, M.D.[1] Drs. Syed, McCann, Spencer, and Catellier testified that, given the specific symptoms from which K.O. suffered as well as the progression of the symptoms, he died of some form of blunt force, inflicted injury, which was either a shaking or a slamming. Dr. Ekhardt opined that, though she could not say what caused the trauma, K.O. died from an inflicted trauma. Dr. Kirby also testified and agreed with the other physicians that K.O. died from a trauma injury.

---

[1] Dr. Ekhardt, a pediatric intensive care physician, was K.O.'s treating doctor when he was first admitted to Blank Children's Hospital. She consulted with Dr. McCann, a child abuse pediatrician, who examined K.O. after his C.T. scan. After K.O. died, Dr. Spencer, a pediatric ophthalmologist, examined K.O.'s eyes to determine whether he suffered from abusive head trauma. The State's medical examiner, Dr. Catellier, sent K.O.'s eyes for further examination to Dr. Syed, an ophthalmologist at the University of Iowa Hospitals and Clinics. Dr. Catellier also sent K.O.'s brain to Dr. Kirby, a neuropathologist at the University of Iowa Hospitals and Clinics.

The defense expert, Zhongxue Hua, M.D., testified that, to a reasonable degree of medical certainty, K.O. died from cortical vein thrombosis. He came to this conclusion after examining K.O. post-mortem. Dr. Hua then explained this is a disorder that causes the blood to clot inside of blood vessels, which prevents the blood from leaving the brain. This in turn causes extensive hemorrhaging and swelling in the brain, which causes death. He based this opinion on the presence of recanalization and calcification in the blood vessels, which occurs when the vessel attempts to move or punch through the thrombosis so the blood may flow normally again. Dr. Hua opined this recanalization and calcification indicated the thrombosis was at least ten days old, which was supported by Olea's claim that K.O. was fussy before his admission to the hospital. He further testified that this is a very rare disease that affects approximately 1 in 200,000 people and is not always fatal. None of the State's experts agreed with Dr. Hua's opinion that K.O.'s death was caused by cortical vein thrombosis, due to the nature of K.O.'s injuries.

Following the guilty verdict, Olea moved for a judgment of acquittal, arguing the evidence did not support the verdict. The district court denied the motion. Defense counsel then requested the jury be polled. The transcript indicated a thirteenth juror responded "yes" when asked by the district court if the guilty verdict was each juror's verdict. No objection was made. On February 10, the district court sentenced Olea to a term of incarceration not to exceed fifty years and also ordered him to pay various fees, including the cost of K.O.'s autopsy. Olea appeals.

## II. Standard of Review

We review claims for sufficiency of the evidence for correction of errors at law. *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997). We view the evidence in the light most favorable to the prevailing party—here, the State—and make all reasonable inferences that may be deduced from the record. *Id.* The jury's findings are binding on appeal if supported by substantial evidence. *Id.*

With regard to Olea's claim the district court imposed an illegal sentence, we review for correction of errors at law. *See State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009). To the extent we are addressing constitutional claims, our review is de novo. *Id.*

## III. Sufficiency of the Evidence

Olea first asserts sufficient evidence does not support the jury's guilty verdict. He argues the State's medical experts and the treating physicians missed signs that K.O. suffered from a pre-existing medical condition known as cortical vein thrombosis, which was the conclusion the defense expert supported; thus, his conviction should be vacated because the evidence established K.O.'s death was due to a disease, rather than physical trauma. Olea also argues, alternatively, that there is insufficient evidence he was the person who caused K.O.'s injury and subsequent death.

To prove Olea committed the crime of child endangerment causing death, the jury was instructed that the State was required to show, beyond a reasonable doubt, that: (1) Olea had custody and control of a child (K.O.); (2) K.O. was less than fourteen years old; (3) Olea intentionally used unreasonable force, torture,

or cruelty against K.O.; and (4) this act of child endangerment resulted in K.O.'s death. *See* Iowa Code §§ 726.6(1)(b) & 726.6(4).

The issue of K.O.'s cause of death was a matter of competing expert opinions. Extensive testimony from well-qualified physicians who either treated K.O. or examined his body after his death indicated K.O. died from inflicted trauma. They further opined that this acute trauma was due to a shaking or slamming, given the nature of K.O.'s injuries—particularly the injuries to his eyes and the trauma to his brain. Dr. Hua, the defense's expert, testified this was an incorrect diagnosis and that K.O. died from the disease of cortical vein thrombosis. However, this opinion was not shared by any of the State's experts, with several specifically ruling out this possibility as the cause of death, particularly because of the bruises on K.O.'s head and ribs.

As our supreme court has noted, "it is solely the province of the jury to determine what weight expert testimony should receive." *State v. Lindsey*, 302 N.W.2d 98, 103 (Iowa 1980); *see also Cedar Rapids Comty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 850 (Iowa 2011). Given the extensive testimony indicating K.O. died from an inflicted trauma that was a shaking or slamming, as well as our case law establishing the credibility and weight of expert testimony is within the fact finder's purview, substantial evidence supports the jury's conclusion K.O. died from an inflicted trauma. This conclusion is also reinforced by the requirement that we are to view the evidence in the light most favorable to the verdict—and, in this case, the great weight of the evidence is in favor of the guilty verdict. *See Thomas*, 561 N.W.2d at 39.

Sufficient evidence also supports the jury's finding that Olea was the one who inflicted the injury causing K.O.'s death. Drs. Catellier, Ekhardt, and McCann testified K.O. would have begun to show severe symptoms, such as arching his back and limpness, immediately after the injury occurred. These physicians opined that, given the timeframe in which K.O. began to exhibit these symptoms, the trauma occurred mid-morning to early afternoon on January 9. It is undisputed K.O. was in Olea's sole care during this timeframe.

The doctors' testimony regarding the timeframe is also supported by the information Olea gave to the investigating officers, that K.O. appeared somewhat fussy the night before but otherwise normal, took his first morning bottle well, and only exhibited severe symptoms after the two woke up from their nap. Though Olea stated at trial K.O. appeared fussy and in pain prior to the morning of January 9, the jury was free to place more weight on Olea's statements to the officers. *See Lindsey*, 302 N.W.2d at 103. Moreover, these statements were closer in time to K.O.'s death than his trial testimony, which was two years later. *See generally State v. Fletcher*, 286 N.W.2d 215, 217 (Iowa 1979) (noting contemporaneous statements are more reliable). Therefore, substantial evidence supports the jury's conclusion Olea was responsible for the injury causing K.O.'s death. *See State v. Sayles*, 662 N.W.2d 1, 6–7 (Iowa 2003) (rejecting sufficiency challenge because the child's condition deteriorated while in the defendant's care, and experts testified that the victim would have "immediately exhibited symptoms of shaken baby syndrome"). Consequently, we affirm Olea's conviction for child endangerment resulting in death.

## IV. Autopsy Costs

Olea next claims the district court imposed an illegal sentence when it ordered him to pay the costs of K.O.'s autopsy. Specifically, he asserts the court lacked the statutory authority to order him to pay these costs, and, therefore, imposed an illegal sentence. The State concedes the court erred in this regard.

Iowa Code section 331.802(2)(b) (2013) states a defendant is responsible for the costs of the victim's autopsy if convicted of certain offenses. However, child endangerment resulting in death is not included in this list, which indicates the legislature did not intend for this to be a crime that would render the defendant responsible for the autopsy cost. *See* Iowa Code § 331.802(2)(b); *see also State v. Wolford Corp.*, 689 N.W.2d 471, 475 (Iowa 2004) ("[T]he legislature expresses its intent by omission."). Moreover, the cost of an autopsy is not listed as a cost under either Iowa Code sections 625.14 or 815.13, the code sections specifying the costs for which a convicted defendant is responsible. Consequently, we conclude the district court erred in ordering Olea to pay for the cost of K.O.'s autopsy, and we vacate this portion of the sentence and remand for entry of a corrected sentencing order consistent with this ruling.

## V. Thirteenth Juror

Olea's final claim asserts the presence of a thirteenth juror during deliberations violated his right to a fair trial and due process under the Iowa Constitution. He cites the fact the thirteenth juror—who had been selected as an alternate—stated, when polled, that the guilty verdict was her verdict. Thus, he assumes she participated in the jury deliberations, which resulted in a structural error in violation of article I, sections 9 and 10 of the Iowa Constitution.

Therefore, he asserts, our court should vacate his conviction and order a new trial.  Alternatively, he claims trial counsel was ineffective for failing to make an objection in this regard.

As an initial matter, Olea did not preserve error on this claim—he conceded he did not object at trial, and therefore the district court made no ruling on this issue.  *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) (noting that if counsel fails to object and the district court does not rule on the issue, error is not preserved).  Furthermore, our case law counsels the potential existence of a thirteenth juror during deliberations requires an objection for error to be preserved.  *See State v. Epps*, 313 N.W.2d 553, 555–56 (Iowa 1981) (holding the defendant did not preserve error when he failed to object when a thirteenth juror was present during the beginning of deliberations).  Consequently, we will review this claim within an ineffective-assistance-of-counsel framework.

A defendant may raise an ineffective-assistance claim on direct appeal if the record is adequate to address the claim.  *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).  We may either decide the record is adequate and issue a ruling on the merits, or we may choose to preserve the claim for postconviction proceedings.  *Id.*  We review ineffective-assistance-of-counsel claims de novo.  *Id.*  To succeed on this claim, the defendant must show, first, that counsel breached an essential duty, and second, that he was prejudiced by counsel's failure.  *Id.*

Given the sparse record present here, there is not an adequate basis on which we may decide this claim.  *See State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004) ("Ordinarily, ineffective assistance of counsel claims are best

resolved by postconviction proceedings to enable a complete record to be developed and afford trial counsel an opportunity to respond to the claim."). The only information present in the record shows a thirteenth juror responded to the district court's polling when it inquired whether the guilty verdict was each juror's verdict. This does not clearly establish the alternate was present during the actual deliberations, given she could have simply remained in the courtroom. Therefore, the record is inadequate to address Olea's claim, and it is preserved for possible postconviction relief proceedings, where a more complete record may be established. *See id.*; *see also* S*traw*, 709 N.W.2d at 133.

Based on the foregoing conclusions, we affirm Olea's conviction of child endangerment causing death but vacate the portion of his sentence requiring him to pay the costs of K.O.'s autopsy. Furthermore, we preserve for possible postconviction-relief proceedings his claim of error that a thirteenth juror was present for deliberations, in violation of his right to a fair trial.

**CONVICTION AFFIRMED; SENTENCE VACATED IN PART AND REMANDED.**